# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT MUIR WADE,

    Plaintiff,

    v.

MONROE COUNTY DISTRICT
ATTORNEY, et al.,

    Defendants.

CIVIL ACTION NO. 3:15-cv-00584

(SAPORITO, M.J.)

## MEMORANDUM

This is a federal civil rights action, brought under 42 U.S.C. § 1983. The plaintiff, Robert Muir Wade, is a state prisoner incarcerated at SCI Dallas, located in Luzerne County, Pennsylvania. He is serving a sentence of life in prison without parole. Appearing through counsel, he alleges that the defendants' failure to release certain physical evidence to him for DNA testing has violated his federal constitutional rights. He seeks an order from this Court directing the defendants to release this evidence for DNA testing, plus costs and attorney fees.

## I. FACTUAL BACKGROUND

We defer to the Superior Court of Pennsylvania, which has ably summarized the facts underlying Wade's criminal conviction:

[Wade] and the victim had known each other for approximately six years and had lived together at one point during their relationship. Although [Wade] was married, he and the victim had sexual relations until at least two months before the victim's death.

As the victim did not own a vehicle, [Wade] routinely drove her to and from work. [Wade] admitted that he drove the victim to work on November 26, 1996, the day she was last seen alive. It was also confirmed that the victim made various telephone calls to [Wade] that day from her workplace. The victim had also telephoned her mother and explained that she was going to meet [Wade] after work to shop for a vehicle. Several business cards of car dealers were found in the victim's pockets. [Wade] testified that he talked to the victim at approximately 5:00 p.m., which was also the last time she was seen alive. [The victim's] body was discovered six days later, on December 2, 1996.

On December 3, 1996, a search warrant was issued in New Jersey for [Wade's] automobile. During the search, the police found bloodstains on the back of the passenger seat. The autopsy revealed that the victim had bled from the nose and that there was a substantial amount of blood around her mouth and on the top of her turtleneck. The Commonwealth introduced evidence establishing that the blood found in the vehicle matched the victim's blood within 1 of 207,000 in the African-American population.

In the trunk of [Wade's] automobile, the police discovered plastic shopping bags. One of these bags contained "Pathmark" brand products and a receipt from a "Pathmark" store in Montclair, New Jersey[,] dated November 26, 1996. The receipt was timed at approximately 1:25 p.m. and had the victim's name on it. The information on the receipt was corroborated with a timed videotape depicting the victim at this store

purchasing items found in the shopping bags. The victim was wearing the same clothes that she was found in when her body was discovered on December 2, 1996.

The garbage bag that the body was found in also led to evidence linking [Wade] to the crime. On December 3, 1996, [Wade's] wife consented to a search of their home. During the search, the police found clothing that belonged to the victim. [Wade's] wife gave police a garbage bag, which was identical to the bag in which the victim was found. Two days later, while executing a search of [Wade's] home on December 5, 1996, the police found a box of these particular garbage bags in the basement.

The garbage bags in this case were unusual and proved to be important circumstantial evidence. The Commonwealth presented two experts in bag manufacturing to testify about the garbage bags. Frank Ruiz, one of the experts, testified that the bag in which the body was found and the bags discovered in [Wade's] home were manufactured by the same company within the same eight hours. Tests revealed that they were institutional garbage bags, not commonly sold in the consumer market. Further, the process by which this particular garbage bag was manufactured revealed that it was extremely uncommon within the garbage bag industry.

*Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719, at *1

(Pa. Super. Ct. Mar. 20, 2013) (unpublished opinion) (brackets omitted). In

1998, Wade was arrested and charged with the victim's murder. *Id.* at *2.

## II.  PROCEDURAL HISTORY

On April 3, 2000, following a jury trial, Wade was convicted in the

Court of Common Pleas of Monroe County for first-degree murder and abuse of a corpse. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On July 18, 2000, Wade was sentenced to serve a term of mandatory life imprisonment without parole for the first-degree murder conviction and a term of 1 to 2 years imprisonment for abuse of a corpse. *Id.* His conviction and sentence were affirmed on direct appeal by the Superior Court of Pennsylvania on October 12, 2001. *Commonwealth v. Wade*, Docket No. 3406 EDA 2000 (Pa. Super. Ct.). Nearly a year later, on September 10, 2001, Wade filed a *nunc pro tunc* petition for allocatur with the Supreme Court of Pennsylvania, which was denied on December 16, 2002. *Commonwealth v. Wade*, Docket No. 208 MM 2002 (Pa.).

On June 9, 2003, Wade filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Wade v. Warden of SCI Rockview*, Case No. 4:03-cv-00952 (M.D. Pa. filed June 9, 2003). On December 2, 2004, Wade's petition was denied by this Court. *Id.* Wade filed an untimely appeal to the Third Circuit, which remanded the case for this Court to determine in the first instance whether a certificate of eligibility should issue. *Id.* On February 7, 2006, this Court declined to issue a certificate of appealability. *Id.* On December 21, 2006, the Third Circuit likewise denied

Wade's request for a certificate of appealability. *Id.*

In the meantime, Wade filed a *pro se* PCRA petition in the state trial court on August 23, 2004. Counsel was appointed thereafter to represent Wade in the PCRA proceedings. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On February 7, 2005, the PCRA court denied Wade's PCRA petition as untimely filed. *Id.* The denial of this first PCRA petition was affirmed on appeal by the Superior Court on August 22, 2005. *Commonwealth v. Wade*, 885 A.2d 587 (Pa. Super. Ct. 2005) (table decision) (No. 586 EDA 2005).

On or about September 1, 2005, Wade submitted a *pro se* motion for post-conviction DNA testing for filing in the state trial court. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). Because he was represented by counsel of record, the trial court forwarded the motion to his attorney without docketing or recording it, as required under state rules of civil procedure. *Id.*

On or about May 8, 2006, Wade filed a second *pro se* PCRA petition, which was denied by the PCRA court on May 9, 2006, as having been previously litigated, and therefore barred from further review. *Id.* The denial of this second PCRA petition was affirmed on appeal by the

Superior Court on November 9, 2006. *Commonwealth v. Wade*, 915 A.2d 152 (Pa. Super. Ct. 2006) (table decision) (No. 1372 EDA 2006).

On or about June 12, 2006, Wade filed a second *pro se* motion for post-conviction DNA testing. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). In this motion, Wade sought testing of the following evidence: (1) blood stains collected from Wade's vehicle; (2) any semen found on the victim; (3) finger and palm print analysis of latent prints on the garbage bag in which the victim's body was found; (4) hairs found on the passenger-side floor mats that were microscopically compared to the victim's hair and found to be similar; (5) hairs found on the driver-side rear floor; and (6) other hairs found in the vehicle that were not suitable for comparison. (Doc. 23, at 3; Doc. 23-2, at 104). On December 4, 2006, the state trial court notified Wade of its intention to deny the petition on multiple grounds. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On December 27, 2006, the state trial court denied the motion for the stated reasons that Wade failed to meet the requirements for post-conviction DNA testing of evidence that was available prior to trial, and that there was no reasonable probability that testing would produce favorable results

that would establish his actual innocence of the offense for which he was convicted. (Doc. 23-2, at 105). The denial of this second motion for DNA testing was affirmed on appeal by the Superior Court on December 10, 2007. *Commonwealth v. Wade*, 945 A.2d 771 (Pa. Super. Ct. 2007) (table decision) (No. 190 EDA 2007). In particular, the Superior Court agreed with the trial court that the requested DNA testing, regardless of its results, would not have demonstrated Wade's actual innocence. (Doc. 23-2, at 105–06 & n.10). Four months later, on or about April 2, 2008, Wade filed a *nunc pro tunc* petition for allocatur with the Supreme Court of Pennsylvania, which was denied on September 2, 2008. *Commonwealth v. Wade*, Docket No. 80 MM 2008 (Pa.).

On December 9, 2011, Wade filed his third motion for post-conviction DNA testing, this time appearing through counsel. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). This third motion sought additional testing not requested in the second motion for DNA testing, including the following evidence: (1) the fingernails of the victim and any scrapings from those fingernails; (2) the victim's yellow turtleneck sweater, which had blood stains on it; (3) the victim's leather coat, bra, underpants, pantyhose, and shoes; (4) the trash bag in which the

victim's body was found;[1] and (5) the contents of the victim's coat, which were removed and inventoried by police investigators. (Doc. 21, at 3–4; Doc. 23, at 4; Doc. 23-2, at 45 & nn.1–4). On March 21, 2012, Wade filed a supplement to his third motion for DNA testing, requesting that these same pieces of evidence be tested for "touch DNA," using new testing technologies not previously available. (Doc. 23-2, .at 109–11 & nn.1–4). On June 15, 2012, the state PCRA court denied the motion. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). In denying his motion, the PCRA court considered the evidence presented at trial and the particular testing requested, and it found that there was no reasonable probability that testing would produce favorable results that would establish his actual innocence of the offense for which he was convicted. (Doc. 23-2, at 12–15). The denial of this third motion for DNA testing was affirmed on appeal by the Superior Court on March 20, 2013. *Commonwealth v. Wade*, 69 A.3d 1297 (Pa. Super. Ct. 2013) (table decision); *Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719 (Pa. Super. Ct. Mar. 20, 2013) (unpublished opinion). In

---

[1] While the second motion requested forensic analysis of the trash bag, it did not request DNA testing.

affirming the PCRA court decision, the Superior Court found that, in light of the evidence presented at trial,

> even assuming DNA testing would reveal DNA from someone other than [Wade] or the victim on the multiple items [Wade] seeks to have tested, [Wade] does not demonstrate it is more likely than not that no reasonable juror confronted with the DNA and other evidence would find [Wade] guilty beyond a reasonable doubt.

*Wade*, 2013 WL 11273719, at *3. Wade filed a timely petition for allocatur with the Supreme Court of Pennsylvania, which was denied on November 15, 2013. *Commonwealth v. Wade*, 80 A.3d 777 (Pa. 2013) (table decision) (No. 277 MAL 2013).

Appearing through counsel, Wade filed his original complaint in this action on March 24, 2015. (Doc. 1). The original complaint named three defendants: (a) the Monroe County District Attorney's Office; (b) the Commonwealth of Pennsylvania; and (c) E. David Christine, District Attorney for Monroe County, sued in his official capacity only. (*Id.*). Wade seeks injunctive relief only. (*Id.*).

On April 18, 2015, the defendants filed their answer to the complaint. (Doc. 6). On August 5, 2015, Wade moved for leave to amend his complaint to eliminate the Commonwealth of Pennsylvania as a defendant to the action based on its immunity from suit under the

Eleventh Amendment to the United States Constitution. (Doc. 7). On August 10, 2015, the Court granted Wade's motion, and the Commonwealth was terminated as a defendant to this action. (Doc. 9).

On October 14, 2016, following the exchange of discovery, the remaining defendants filed a motion for summary judgment, together with a statement of material facts and a brief in support. (Doc. 20; Doc. 21; Doc. 22). On November 4, 2016, Wade filed his answer to the statement of facts, together with several documentary exhibits and a brief in opposition to summary judgment. (Doc. 23; Doc. 24). On September 29, 2017, we denied the defendants' motion for summary judgment and dismissed three of the five counts of the plaintiff's complaint *sua sponte* for failure to state a claim. (Doc. 25; Doc. 26).

On January 10, 2018, the plaintiff filed a motion for summary judgment, together with a statement of material facts and a brief in support. (Doc. 32; Doc. 33; Doc. 34). On January 31, 2018, the defendants filed their answer to the statement of facts, together with a brief in opposition to summary judgment. (Doc. 36; Doc. 37). On February 14, 2018, the plaintiff filed a reply brief in support of summary judgment. (Doc. 40). This motion is ripe for disposition.

## III. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient

disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

The complaint originally contained five separate counts, all brought pursuant to 28 U.S.C. § 1983. *See generally Grier v. Klem*, 591 F.3d 672, 678 (3d Cir. 2010) ("[A] plaintiff can use the § 1983 vehicle to request the release of evidence for postconviction DNA analysis."). Counts III, IV, and V were previously dismissed for failure to state a claim. *See generally Wade v. Monroe Cty. Dist. Attorney*, Civil Action NO. 3:15-cv-00584, 2017 WL 4413195 (M.D. Pa. Sept. 29, 2017). Two counts remain. In Count I, Wade claims that the defendants' refusal to release physical evidence from his criminal case to him for DNA testing was a violation of his procedural due process rights under the Fourteenth Amendment. In Count II, Wade claims that the defendants' refusal to release the physical evidence to him for DNA analysis was a violation of his right to meaningful access to the courts under the First and Fourteenth Amendments.

In his motion for summary judgment, the plaintiff argues that, based on the undisputed material facts of record in this case, he is entitled to judgment on the merits as a matter of law. The defendants have opposed

summary judgment on the merits. Notably, the defendants have not themselves moved for summary judgment.

## A. Procedural Due Process

Wade contends that the defendants violated his procedural due process rights under the Fourteenth Amendment to the United States Constitution, which guarantees fair procedure for the deprivation of a constitutionally protected interest in life, liberty, or property. *See Zinermon v. Burch*, 494 U;.S. 113, 125 (1990). Although the federal constitution does not provide a freestanding substantive due process right to DNA evidence, the Supreme Court has held that a convicted prisoner may have a constitutionally protected liberty interest in demonstrating his innocence with new evidence under state law. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68, 72 (2009); *see also Skinner v. Switzer*, 562 U.S. 562 U.S. 521, 525 (2011). "This 'state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" *Osborne*, 557 U.S. at 68.

Here, as in *Osborne*, we find that Wade has an analogous state-created liberty interest in demonstrating his innocence in the context of post-conviction proceedings with appropriate evidence. *See Wagner v. Dist.*

*Attorney Allegheny Cty., Pa.*, Civil Action No. 11-762, 2012 WL 2090093, at *8 (W.D. Pa. May 21, 2012); *Grier v. Klem*, Civil Action No. 05-05 Erie, 2011 WL 4971925, at *7 (W.D. Pa. Sept. 19, 2011), *report and recommendation adopted by* 2011 WL 5008326 (W.D. Pa. Oct. 19, 2011). Thus, the question is whether, as applied to him, the state procedures for post-conviction DNA testing violated Wade's procedural due process rights. *See Wagner*, 2012 WL 2090093, at *8; *Grier*, 2011 WL 4971925, at *7.

A post-conviction prisoner's procedural due process rights with respect to the disclosure of potentially exculpatory evidence are more limited than those of a pre-conviction criminal defendant. As the Supreme Court has explained:

> A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond a reasonable doubt. But once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.
>
> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. When a State chooses to offer help to those seeking relief from convictions," due process does not dictate the exact form such assistance must assume.

> [A post-conviction prisoner's] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. . . .
>
> Instead, the question is whether consideration of [the prisoner's] claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation. Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

*Osborne*, 557 U.S. at 68–69 (citations and internal quotation marks omitted). Moreover, it is the plaintiff's "burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief." *Id.* at 71.

Pennsylvania has enacted a post-conviction DNA testing statute, 42 Pa. Cons. Stat. Ann. § 9543.1, which permits a convicted prisoner to make a written motion in the sentencing court for the performance of forensic DNA testing on specific evidence related to the investigation or prosecution that led to his conviction. *Id.* § 9543.1(a)(1).

> The statute sets forth several threshold requirements to obtain DNA testing: (1) the evidence specified must be available for testing on the date of the motion; (2) if the

> evidence was discovered prior to the applicant's conviction, it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because his client was indigent, and the court refused the request despite the client's indigency.

*Wagner*, 2012 WL 2090093, at *10 (citing 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2)).

Once these threshold requirements are met, the statute requires the petitioner to present a *prima facie* case demonstrating that (1) the identity of the perpetrator was at issue at trial, and (2) DNA testing of the specified evidence, *assuming exculpatory results*, would establish the applicant's actual innocence of the crime for which he was convicted. 42 Pa. Cons. Stat. Ann. § 9543.1(c)(3). The statute further provides that "[t]he court shall not order the testing requested . . . if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that . . . would establish the applicant's actual innocence of the offense for which the applicant was convicted." *Id.* § 9543.1(d)(2). The statute itself does not define the term "actual innocence," but Pennsylvania state courts have

adopted the definition of "actual innocence" articulated by the Supreme Court of the United States in *Schlup v. Delo*, 513 U.S. 298 (1995): "namely, that the newly discovered evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'" *Commonwealth v. Conway*, 14 A.3d 101, 109 (Pa. Super. Ct. 2011) (quoting *Schlup*, 513 U.S. at 327); *see also In re Payne*, 129 A.3d 546, 556 (Pa. Super. Ct. 2015) (quoting *Conway*, 14 A.3d at 109). Under the statute, "the burden lies with the petitioner to make a *prima facie* case that favorable results from the requested DNA testing would establish his innocence." *Wagner*, 2012 WL 2090093, at *10.

Here, Wade filed a motion in the state PCRA court for post-conviction DNA testing of several items of evidence: fingernail clippings from the victim and scrapings taken from those fingernails; a trash bag that partially covered the body of the victim; a yellow sweater, lavender leather coat, pantyhose, and shoes worn by the victim on the day of her death, and contents recovered from the pockets of the leather coat. In support, he noted that his identity as the perpetrator had been at issue at trial, and that he had been convicted on circumstantial evidence. He noted that security camera footage, payroll timeclock records, and a credit card

receipt were admitted in support of an alibi defense—Wade contended at trial that he had been at work in New Jersey at the time of the victim's death. He further noted that fingerprints and palm prints that did not belong to Wade were found on the trash bag, and that the victim's sweater was inside out when she was found, suggesting that she had been redressed by her assailant. He postulated that testing of the specified evidence for "touch DNA"—a technology not available at the time of trial— might reveal a source other than Wade and the victim, which would constitute a *prima facie* case that someone other than Wade murdered the victim.

Citing *Conway*, Wade argued that three separate theories under which DNA testing of the specified evidence, assuming exculpatory results, might establish his actual innocence of the crime for which he was convicted. As described by the *Conway* court, these three theories are:

> (1) a "redundancy" theory, which postulates that if the individual DNA tests reveal evidence of a third person on multiple items connected with the crime, then those "redundant" results would give rise to an inference of a separate assailant; (2) a "data bank" theory, which postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant; and (3) a

> "confession" theory, which postulates that an assailant who is discovered by using the data bank theory could, when confronted with the DNA evidence, confess to the crime.

*Conway*, 14 A.3d at 110. In *Conway*, the state appellate court weighed these theories against the evidence presented at trial, noting that the evidence at trial was "wholly circumstantial," that there had been no prior history between the defendant and the victim, and that the victim's hands were bound and her clothing ripped in a manner that indicated "extensive contact" with the hands of her assailant. *Id.* at 112. The state appellate court ultimately found that, based on these facts, the plaintiff had satisfied his burden of demonstrating a *prima facie* case that the requested DNA evidence, assuming exculpatory results, would establish his actual innocence. *Id.* at 114.

In Wade's case, the state PCRA court denied his motion, articulating alternative grounds for its decision. First, the PCRA court *sua sponte* found Wade's motion to be untimely, noting that, while "touch DNA" technology was not yet available at the time of trial, it had been available since 2003, and "[a]lthough the statute does not state what constitutes 'a timely manner' for filing of a DNA motion, we do not believe that a delay of eight years from the time the new technology became available constitutes

'a timely manner' for filing a DNA motion." (Doc. 23-2, at 9).[2]

Next, the PCRA court summarized the trial evidence at issue:[3]

---

[2] The post-conviction DNA testing statute provides that the PCRA court should determine whether the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." 42 Pa. Cons. Stat. Ann. § 9543.1(d)(1)(iii). The statute does not define "timely manner," and Pennsylvania courts have mostly sidestepped the timeliness issue, leaving this provision generally undefined. *See Commonwealth v. Edmiston*, 65 A.3d 339, 356 (Pa. 2013) ("Other that a Superior Court panel's observation that 'Section 9543.1 places no time limits on motions for DNA testing,' Pennsylvania courts have not otherwise construed the requirement of timeliness in this context."). In *Edmiston*, the Supreme Court of Pennsylvania addressed the statute's timeliness requirement as a matter of first impression, finding a motion for DNA testing to be untimely filed where the movant knew of the existence of the evidence at issue for more than twenty years and had been represented by counsel in post-conviction proceedings throughout the entire period since his trial. *Id.* at 357. The *Edmiston* court further noted that the DNA motion was only filed as PCRA proceedings were coming to their conclusion, and it had the effect of delaying execution of the movant's death sentence. *Id.* at 358. It should also be noted that the timeliness issue in *Edmiston* had been expressly preserved by the Commonwealth's objection in the PCRA court. *See Payne*, 129 A.3d at 555 n.12 (discussing *Edmiston* and noting that the appellate court could not raise the non-jurisdictional timeliness issue *sua sponte* in *Payne* as it had been waived by the Commonwealth in PCRA proceedings below). In this case, the Commonwealth's brief in the PCRA court opposed the motion on its merits only (Doc. 23-2, at 148–49), and the Superior Court subsequently affirmed on the merits, without discussing timeliness, *see Wade*, 2013 WL 11273719, at *3 n.4.

[3] We note that the PCRA court characterized this as "DNA evidence presented to the jury," but it appears from the state court records that a blood-stained swatch of leather from the back seat of Wade's automobile was the only evidence subjected to pre-trial DNA testing—the blood was

*(continued on next page)*

(1) *Yellow Turtleneck Sweater*: the blood on the front (actually the back) of the sweater was identified as belonging to the victim. The sweater was also tested for fibers. "Three head hairs found on the sweater exhibited similar characteristics to the victim's hair. Black fibers that were also found on the sweater were similar to the black fibers comprising the collar and cuff of the victim's leather coat.

(2) *Fingernails of Victim & Scrapings*: The fingernails of the victim were extremely long (1 to 1-1/2 inches in length) and showed no signs of damage. Fibers found under the fingernails of victim's left hand were found to be the same type of fibers comprising the collar and cuffs of victim's coat. Nothing else was found in or about the nails of the victim and nothing of probative value was found in the bags used to cover victim's right and left hands prior to removing the body from scene.

(3) *Prints on Garbage Bag that Victim was found in*: Fingerprints and palm prints found on the garbage bag that were identified as belonging to George Surma, Forensic Scientist at the Pennsylvania State Police Crime Lab in Wyoming. There were eight prints in all; four sets of fingerprints and four palm prints. The remaining four prints (palm prints) lacked sufficient detail or characteristics to identify to anybody.

(4) *Fibers on Garbage Bag that Victim was found in*: The garbage bag in which victim's body was found was checked for fibers, as well as for any other significant evidence such as blood or body fluids. Nothing was found.

---

identified as that of the victim. (*See* Doc. 23-2, at 76–78, 89, 159–74). The remainder of the evidence appears to have been examined using other forensic laboratory methods, such as serology blood tests and microscopic fiber comparisons. (*See* Doc. 23-2, at 34–38, 63–66, 69–71, 77).

(5) *Underwear and Pantyhose*: The underwear and pantyhose of the victim were tested for seminal matters (combination of sperm cells and seminal fluid) and nothing was found. Also, no fibers were found on the pantyhose or underwear. Similarly, no fibers were found on the purple head band (except victim's hairs) or the flower patterned bra.

(6) None of the fibers collected from various areas of [Wade's] car and trunk were similar to the fibers comprising the victim's clothing.

(Doc. 23-2, at 12–13 (citations omitted)).

The PCRA court then *sua sponte* found that Wade failed to satisfy the statute's threshold requirement that the specified evidence had not already been DNA tested because the technology to do so did not exist at the time of trial. *See* 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2).[4] In particular, the PCRA court acknowledged that "touch DNA" technology was not yet available at the time of trial in 2000, but found that the specified evidence had already "undergone a thorough DNA analysis on fibers, hair and blood[,] and none of [Wade's] DNA was found on any of the items tested."

---

[4] The PCRA court also noted that the case was held after January 1, 1995, and defense counsel had not requested and been refused court funding for DNA testing despite the client's indigency, and thus the other two alternative threshold requirements had not been met. *See* 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2).

(Doc. 23-2, at 13–14).[5]

Finally, the PCRA court found that Wade had failed to present a

*prima facie* case that he was actually innocent. The PCRA court explained:

> [W]e find that [Wade's] assertion that the results of
> Touch DNA analysis of the specified evidence, assuming
> exculpatory results, will establish his actual innocence of
> the murder of Lekitha Council, is speculative and
> irrelevant. [Wade] makes a bald assertion that touch
> DNA will be recovered from the items of evidence and
> that when subjected to the standard DNA processing
> (PCR analysis) the results will show the existence of
> someone other than [Wade]. [Wade's] argument is
> speculative and he offers no evidence to support this bald
> assertion. The Superior Court in [*Commonwealth v.*]
> *Smith*[, 889 A.2d 582 (Pa. Super. Ct. 2005),] held that in
> the face of such speculation, the absence of a defendant's
> DNA cannot be meaningful and cannot establish a
> defendant's actual innocence of the murder. The Court
> state that "The statute does not contemplate the

---

[5] *But see supra* note 3. Moreover, we note that Wade's third motion for DNA testing sought touch DNA analysis not to demonstrate the absence of his DNA where it might be expected to be found if he were the assailant, but to determine if epithelial (skin) cells—not visible to the naked eye and not amenable to earlier, less sophisticated DNA testing methods—from a previously unidentified third-party might be found on the specified evidence in locations and in quantities suggestive of an assailant other than Wade. *See, e.g.*, *Payne*, 129 A.3d at 560–62. The Commonwealth's brief in the PCRA court opposed the motion only on the ground that Wade had failed to make a *prima facie* case that exculpatory DNA testing results would establish his actual innocence (Doc. 23-2, at 148–49), and the Superior Court subsequently affirmed on this ground, without discussing the statutory threshold requirements, *see Wade*, 2013 WL 11273719, at *3 n.4.

- 23 -

speculative type of argument advanced by appellant. . ." *Smith*, [889 A.2d] at 586. In the present case, there was no evidence presented at trial the [Wade's] DNA was found anywhere on the victim, on her clothes or on the garbage bag that the victim's body was found in. In fact, the jury heard substantial evidence regarding the absence of [Wade's] DNA. Accordingly, [Wade's] request for general DNA and Touch DNA testing of the finger nails of the victim and any scrapings from those fingernails; the yellow turtleneck sweater; the lavender leather coat; the victim's bra, underpants, pantyhose and shoes; the trash bag in which the body of Lekitha Counsel was found; and the contents of the lavender coat of the victim is denied.

(Doc. 23-2, at 14–15). The PCRA court further noted that it had previously found, in earlier post-conviction proceedings, that Wade's conviction had been supported by "overwhelming" evidence, and the Superior Court of Pennsylvania had subsequently affirmed that decision. (*Id.* at 15). As a result of all of this, the PCRA court concluded that "there is no reasonable possibility that the DNA testing requested would produce exculpatory evidence that would establish [Wade's] actual innocence of the crimes for which he was convicted." (*Id.*).

Wade appealed the PCRA court's decision to the Superior Court of Pennsylvania. *Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719 (Pa. Super. Ct. Mar. 20, 2013). The Superior Court noted the standard of review—"whether the [PCRA] court's determination is

supported by the evidence and free of legal error"—and affirmed the lower court's decision on the ground that Wade had failed to demonstrate that the requested DNA testing, assuming exculpatory results, would "make it more likely than not that no reasonable juror confronted with that evidence, along with all the other evidence admitted at trial, would find the defendant guilty beyond a reasonable doubt." *Id.* at \*2, \*3. In support, the Superior Court reviewed the record before it and summarized the material evidence that informed its decision and explained its reasoning:

 [Wade] fails to convince us the court erred in its determination that [Wade] did not present a *prima facie* case as required by the DNA statute. [Wade] and the victim knew each other, having had a preexisting relationship. On November 26, 1996, the last day the victim was seen alive, she was in a certain store wearing the same clothes in which she was found dead six days later. Items from the store and a receipt from that store, a receipt bearing the victim's name and dated November 26, 1996, were found in [Wade's] vehicle. This evidence gives rise to the inference that the victim was in [Wade's] car on the last day she was seen alive and after her trip to the store in question and that, for some reason, the items she bought remained in the car after she was no longer in it. Blood in the back of [Wade's] vehicle was consistent with the victim's blood. The autopsy revealed the victim had bled from her nose and that she died from strangulation. This evidence leads to the inference that the victim was in [Wade's] car during or after her assault and death. Evidence indicated the uncommon garbage bag in which the victim was found was manufactured by the same company within eight hours of garbage bags

round in [Wade's] home. This last bit of evidence allowed the factfinder to infer that [Wade] placed the victim's body in the garbage bag in question after she was dead. Taken together, all the foregoing evidence supports the conclusion that it was [Wade] who killed the victim.

In light of this evidence, as well as the other trial evidence, including the evidence summarized earlier in this memo, and even assuming DNA testing would reveal DNA from someone other than [Wade] or the victim on the multiple items [Wade] seeks to have tested, [Wade] does not demonstrate it is more likely than not that no reasonable juror confronted with the DNA and other evidence would find the defendant guilty beyond a reasonable doubt. . . .

*Id.* at *3. The appellate court declined to address the alternative grounds for dismissal articulated by the PCRA court—timeliness and whether the specified evidence had not been DNA-tested because the technology to do so did not exist at the time of trial. *See id.* at *3 n.4.

Wade filed a timely petition for allocatur with the Supreme Court of Pennsylvania, which was summarily denied. *Commonwealth v. Wade*, 80 A.3d 777 (Pa. 2013) (table decision) (No. 277 MAL 2013).

The parties spend much of their time debating whether the state courts' decisions were legally and factually correct under state law—i.e., whether the motion was timely (a moot point, in light of the Superior Court's affirmance on the merits), whether the specified evidence had been

previously subjected to DNA testing (also a moot point), and whether DNA testing of the specified evidence, assuming exculpatory results, would establish Wade's actual innocence of the crimes for which he was convicted. But under the *Rooker-Feldman* doctrine, we lack jurisdiction to review the state court decisions themselves for legal error. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010); *FOCUS v. Allegheny Cty. Ct. Com. Pl.*, 75 F.3d 834, 840 (3d Cir. 1996).

The question properly before us is a narrow one: Whether the Pennsylvania post-conviction DNA testing statute, as construed by the state courts in Wade's case, "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69; *see also Wagner*, 2012 WL 2090093, at *15. On their face, Pennsylvania's procedures for post-conviction DNA testing do not. *See Wagner*, 2012 WL 2090093, at *15; *see also Osborne*, 557 U.S. at 69–70. Under these procedures, Wade had the

opportunity to file a motion for post-conviction DNA testing and did so.[6] He was represented by counsel. He was afforded a hearing before the PCRA court. He was provided with a reasoned decision by the PCRA court when it denied his motion. He was afforded the opportunity to appeal that decision and did so. He was provided with a reasoned decision by the Superior Court on appeal, when it affirmed the lower court's decision. He was afforded an opportunity to file a discretionary appeal to the Supreme Court and did so. He was provided with written notice of the Supreme Court's denial of allocatur.

Accordingly, in light of this process and in light of the substantial—albeit circumstantial—evidence adduced against Wade at trial, we find that the plaintiff has failed to establish that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law with respect to Count I of the complaint. In particular, we find that, viewing the

---

[6] Notably, he was not barred by a *per se* procedural rule, *cf. Grier*, 2011 WL 4971925, at *8–*9 (finding *per se* rule "[p]rohibiting defendants who have confessed to a crime from accessing DNA evidence after conviction violates the concept of fundamental fairness"), but instead his motion was denied on the merits. Although the PCRA court articulated untimeliness as one of the alternative grounds for dismissal, the PCRA court also addressed Wade's motion on its merits, and the Superior Court addressed his appeal exclusively on the merits, declining to address the timeliness issue at all.

evidence of record in the light most favorable to the non-moving defendants, a reasonable factfinder could find that the state court's application of the post-conviction DNA testing statute in Wade's case was not fundamentally unfair.

## B. Access to Courts

Wade also contends that the defendants violated his constitutional right of access to courts by denying him access to potentially exculpatory DNA evidence.

It is well-established that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). At least one federal court has found that "[d]enying prisoners access to potentially exculpatory DNA evidence limits meaningful access to the courts in even more profound terms than denying access to a law library or attorney." *Wade v. Brady*, 460 F. Supp. 2d 226, 250 (D. Mass. 2006). But "[a] prisoner raising an access-to-courts claim must show that the denial of access caused him to suffer an actual injury." *Garcia v. Dechan*, 384 Fed. App'x 94, 95 (3d Cir.

2010) (per curiam); *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996). "An actual injury occurs when the prisoner is prevented from or has lost the opportunity to pursue a 'nonfrivolous' and 'arguable' claim." *Garcia*, 384 Fed. App'x at 95; *see also Christopher v. Harbury*, 536 U.S. 403, 415 (2002). This injury requirement reflects the fact that "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher*, 536 U.S. at 414–15.

Here, the underlying claim is a prospective PCRA petition in which Wade would seek release or a new trial based upon any exculpatory DNA evidence obtained as a result of his motion for post-conviction DNA testing. The denial of that motion, impeding his access to potentially exculpatory DNA evidence, is the official act frustrating that prospective litigation and purportedly denying Wade meaningful access to the courts. But Wade's argument here essentially mirrors his *Osborne*-based due process claim. Because we have concluded that, viewing the evidence in the light most favorable to the non-moving defendants, a reasonable factfinder could find that the state court's application of the post-conviction DNA testing statute in Wade's case was not fundamentally

unfair, it likewise follows that it does not improperly interfere with Wade's right of access to the courts. *See Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1272 (11th Cir. 2010).

Accordingly, we find that the plaintiff has failed to establish that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law with respect to Count II of the complaint. In particular, we find that, viewing the evidence of record in the light most favorable to the non-moving defendants, a reasonable factfinder could find that the state court's application of the post-conviction DNA testing statute in Wade's case did not deny him of meaningful access to the courts.

## V. CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment (Doc. 32) will be denied.

An appropriate order will follow.

Dated: June 15, 2018

*s/ Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge