IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT MUIR WADE,<br>Plaintiff<br>v.<br><br>MONROE COUNTY DISTRICT<br>ATTORNEY, etal.,<br>Defendants | No. 3:15-CV-00584-ARC<br><br>Jury Trial Demanded<br><br>Magistrate Judge Saporito |

**Joint Stipulation of Facts**

The parties, through their respective counsel, agree that the following facts are undisputed and that the court may rely upon these facts in lieu of presenting evidence at a non-jury trial.

**Evidence at Criminal Trial**

1. On December 2, 1996, hunters discovered the body of Lekitha Council partially enveloped in a garbage bag in a rural area of PoconoTownship, Monroe County, Pennsylvania.

2. Dr. Isidore Mihalakis, a forensic pathology expert, conducted the autopsy and concluded that Council was the victim of homicide by manual strangulation or suffocation.

3. Dr. Mihalakis testified at Wade's criminal trial that Council had been dead for three to five days at most.

4. Robert Muir Wade was charged with the murder.

5. The following evidence was presented by the Commonwealth at Wade's criminal jury trial before the Monroe County Court of Common Pleas:

**Evidence Leading up to Council's Death**

 a. Wade and Council knew each other for approximately six years and had lived together at one point during their relationship.

 b. Although Wade was married, he and Council had sexual relations until at least two months before Council's death.

 c. Wade routinely drove Council to and from work because she did not own a vehicle.

 d. Wade admitted he drove Council to work on November 26, 1996, the last day she was seen alive.

 e. Council made various telephone calls to Wade that day from her workplace.

 f. Council had also telephoned her mother and explained that she was going to meet Wade after work to shop for a vehicle.

g. Several business cards of car dealers were found in Council's pockets. Wade testified that he talked to Council at approximately 5:00 p.m., which was also the last time she was seen alive.

h. Council's body was discovered six days later, on December 2, 1996.

**Blood in Wade's Car**

6. On December 3, 1996, a search warrant was issued in New Jersey for Wade's car.

7. During the search, the police found bloodstains on the back of the passenger seat.

8. The autopsy revealed that Council had bled from the nose and that there was a substantial amount of blood around her mouth and on the top of her turtleneck.

9. The Commonwealth introduced evidence establishing that the blood found in the vehicle matched Council's blood within 1 of 207,000 in the African-American population.

**Pathmark Shopping Bags**

10. The police discovered plastic shopping bags in the trunk of Wade's car.

11. One of these bags contained "Pathmark" brand products and a receipt from a "Pathmark" store in Montclair, New Jersey dated November 26, 1996.

12. The receipt was time-stamped at approximately 1:25 p.m. and had Council's name on it.

13. The information on the receipt was corroborated with a timed videotape depicting Council at this store purchasing items found in the shopping bags.

14. Council was wearing the same clothes she was found in when her body was discovered on December 2, 1996.

15. Evidence was introduced at trial that Wade was familiar with the area in which the body was found.

16. Specifically, the Commonwealth established that Wade had stayed at the Caesar's Brookdale Resort in July, 1996. This resort was within a few miles of where the body was found. The body was found near Route 314. Evidence was introduced that Dyson Road directly linked Caesar's Brookdale to Route 314. Dyson Road is located 30-40 yards south of where the body was found.

17. Council's mother testified at trial that, considering the nature and 6-year length of the relationship between Wade and Council, she considered it "strange" that when informed of Council's death, Wade did not ask for any details.

18. The Commonwealth tested the trash bag in which Ms. Council's body was found. The test did not find the DNA of Mr. Wade but did detect the DNA of another individual. The bag was also tested for fingerprints. No fingerprints of Mr. Wade were found but the fingerprints of another individual were found on the bag.

**Council's Clothing was in Wade's Home**

19. On December 3, 1996, Wade's wife consented to a search of their home.

20. During the search, the police found clothing that belonged to Council.

**Unique Garbage Bags**

21. Wade's wife gave police a garbage bag, which was identical to the bag in which the victim was found.

22. On December 5, 1996, while executing a search of Wade's home, the police found a box of these particular garbage bags in the basement.

23. The garbage bags in this case were unique.

24. The Commonwealth presented two experts in bag manufacturing to testify about the garbage bags:

   a. Frank Ruiz, one of the experts, testified that the bag in which the body was found and the bags discovered in Wade's home were manufactured by the same company within the same eight hours.

  b. Tests revealed that the bags were institutional garbage bags, not commonly sold in the consumer market.

  c. Further, the process by which this particular garbage bag was manufactured revealed that it was extremely uncommon within the garbage bag industry.

THE DEFENSE

25. The defense established that Ms. Council had a key to Wade's car.

26. Security cameras did not reveal that Mr. Wade left work early. According to the time clock kept by Cunningham Graphics where Mr. Wade worked full-time, Mr. Wade punched in at 3:00 p.m. and punched out at 11:00 p.m. on November 26th and punched in at 3:00 and out at 11:32 p.m. on November 27th.

27. The defense introduced a credit card receipt indicating that Mr. Wade purchased gas at 1:40 p.m. on November 26, 1996 in Plainfield, New Jersey.

28. Although on the day she disappeared, Ms. Council was seen at a Pathmark at 1:25 pm buying food items that were found in the trunk of Mr. Wade's vehicle, after purchasing those items, Ms. Council returned to her place of employment and her co-workers saw her leaving at 5 P.M.

29. Ms. Council called Mr. Wade at his place of employment at 5 P.M.

30. Ms. Council's mother believed that she was away with a man other than Mr. Wade and did not report her missing.

31. The Commonwealth tested the trash bag in which Ms. Council's body was found. The test did not find the DNA of Mr. Wade but did detect the DNA of another individual. The bag was also tested for fingerprints. No fingerprints of Mr. Wade were found but the fingerprints of another individual were found on the bag.

**Criminal Trial Conviction**

32. In 2000, a jury convicted Wade of first degree murder, 18 Pa.C.S.A. 2502(a) and abuse of a corpse, 18 Pa.C.S.A. 5510.

33. On July 18, 2000, Wade was sentenced to mandatory life for First Degree Murder, and a concurrent term of 1-2 years' imprisonment for Abuse of a corpse.

**Wade's Challenges to His Conviction**

34. Wade appealed his conviction and sentence to the Pennsylvania Superior Court, which affirmed the judgment of sentence in 2001. Commonwealth v. Wade, 790 A.2d 344 (Pa.Super. October 12, 2001)(unpublished memorandum).

35. The Pennsylvania Supreme Court denied Wade's petition for leave to file a petition for allowance of appeal *nunc pro tunc* on December 16, 2002 (208 MM 2002).

36. On August 23, 2004, Wade filed his first petition under the Post Conviction Relief Act ("PCRA").

37. The PCRA court appointed counsel and later dismissed the PCRA petition as untimely. The Superior Court affirmed the dismissal in 2005. Commonwealth v. Wade, 885 A.2d 587 (Pa. Super. 2005) (unpublished memorandum).

38. On May 8, 2006, Wade filed his second PCRA petition requesting DNA testing. The PCRA court denied relief on the grounds that the petition was "untimely." The Superior Court affirmed the denial of Wade's second PCRA petition. *Commonwealth v. Wade*, 915 A.2d 152 (Pa. Super. 2006).

**Wade's DNA Testing Requests**

39. On September 9, 2005, Wade filed a pro se motion for Post Conviction DNA testing and preservation of certain evidence. The Court ordered that the pro se motion be forwarded to Wade's attorney.

40. On May 8, 2006, Mr. Wade filed a second PCRA petition requesting DNA testing. On May 9, 2006, the Common Pleas Court judge dismissed it as "untimely". While his appeal was pending, on June 12, 2006, Mr. Wade resubmitted his motion for DNA testing.

41. On November 9, 2006, the Superior Court affirmed the denial of Mr. Wade's second PCRA petition. ***Commonwealth v. Wade,*** 915 A2d 152 (PA. Super, 2006) (unpublished) [RR92]

42. On December 4, 2006, the trial judge filed a notice of disposition without a hearing stating that Mr. Wade was not entitled to DNA testing.

Mr. Wade requested DNA testing of the following items:

Blood stains collected from appellant's vehicle;

Any semen found on the victim;

Finger and palm print analysis of latent prints on the garbage bag in which the victim's body was found;

hairs found on the passenger side floor mats that were microscopically compared to the victim's hair and found to be similar;

hairs found on the driver's side rear floor, and

other hairs found in the vehicle which were not suitable for comparison. [RR, p. 97].

43. On December 27, 2006, the trial court filed an Opinion and Order denying the motion for post conviction DNA testing and other outstanding motions.

44. On December 10, 2007, the Superior Court affirmed. The Superior Court did not reach the question of whether Mr. Wade's Motion for Post-

Conviction DNA testing was timely filed. Instead, the Superior Court affirmed the denial of the motion because it concluded that the DNA testing of the items identified in the Motion would not have established Mr. Wade's actual innocence.

45. According to the PCRA court's opinion filed June 12, 2012, Mr. Wade filed a second Pro Se motion for Post-Conviction DNA testing and Preservation of Certain Evidence on December 27, 2006. The Motion was denied by Order dated January 2, 2007. The Superior Court affirmed the denial of the request for DNA testing on December 10, 2007.

46. On December 9, 2011, Mr. Wade filed his third Motion for Post-Conviction DNA testing. In that motion, Mr. Wade requested DNA testing of the following items:

1. The fingernails of the victim and any scrapings from those fingernails;

2. the yellow turtle neck sweater worn by the victim and which had a blood stain at the neck and on the body of the sweater; lavender leather coat, bra, underpants, pantyhose and shoes of the victim;

3. trash bag in which the body of the victim was found;

4. the contents of the lavender coat of the victim. [RR38]

47. Those items of evidence continue to exist and have not been subjected to DNA testing and had never been subjected to DNA testing. The items are in the possession of the Pennsylvania State Police.

48. Mr. Wade filed a Supplemental Motion on March 21, 2012. In the Supplemental Motion, he requested that the items enumerated in paragraph 16 be subjected to the new technology of "Touch" DNA testing.

49. On March 22, 2012, the Court held a hearing limited to argument on the motion and supplemental motion . Mr. Wade filed a Supplemental Memorandum of Law in Support of the Motion on April 19, 2012. In the Supplemental Memorandum, Mr. Wade requested that the DNA testing be done at the Commonwealth's expense and that the results of the DNA testing be sent for inclusion in CODIS for comparison with that data base and should be loaded into the Pennsylvania and Federal DNA data bases for testing.

50. "CODIS" is a computer software program that operates local, state and national databases of DNA profiles from convicted offenders, unsolved crime evidence and missing persons.

51. On June 15, 2012, the Court entered an order denying Mr. Wade's third petition for DNA testing and Supplemental Motion for Touch DNA Testing and filed an Opinion.  In the Opinion, the PCRA Court recognized that "Touch DNA

testing is a new technology that has become available since Defendant's trial in 2000; however, we note that this new technology was available in 2003, three years before Defendant's last (second) request for DNA testing and 8 years prior to the present motion. Thus, we do not believe the present motion was filed in a timely manner. " In the alternative, the PCRA Court found, erroneously, that some of the items that were the subject of Mr. Wade's motion for DNA testing and supplemental motion for DNA testing had already been subjected to DNA testing.

52. The forensic records and the trial testimony of the forensic scientist at the Pennsylvania State Police DNA crime lab established that DNA tests were performed on four items, only: K-1 [alcohol patches of the victim's blood], Q-1 [a cotton patch with a stain], and Q-2 [ a control sample], Q-3 [a piece of leather with a stain], and Q-4 [a unused cotton patch used to make Q-1].

53. The only DNA testing was done to match the victim's blood to a small spot of blood on the seat of Mr. Wade's automobile. The DNA scientist specifically testified she was **not** provided with "any additional samples of anything else to test (sic) relationship the case."

54. The PCRA Judge's conclusion that the pieces of evidence Mr. Wade requested be subjected to DNA testing had previously been tested is contrary to the record.

55. Mr. Wade filed a timely notice of appeal. On March 20, 2013, the Pennsylvania Superior Court affirmed and on November 15, 2013, the Pennsylvania Supreme Court denied a Petition for Allowance of Appeal.

56. Plaintiff has maintained and continues to maintain that he is actually innocent.

**Habeas Petition**

57. On June 9, 2003, Mr. Wade filed a counseled petition for habeas corpus with the United States District Court, Middle District of Pennsylvania. Docket number 4:03-cv-00952-JEJ.

58. The Court denied the petition on December 2, 2004.

59. On December 20, 2006 the United States Court of Appeals for the Third Circuit denied an application for certificate of appealability.

**The Section 1983 Action**

60. Wade filed this Section 1983 action on March 24, 2015 asking for the following relief:

    a. Ordering the District Attorney to take all steps reasonably necessary to preserve the physical evidence taken from the victim's body including the fingernails of the victim and any scrapings from those fingernails; the yellow turtle neck sweater worn by the victim and which had a blood stain on the neck and body of the sweater; the

lavender leather coat; the bra, underpants, pantyhose and shoes of the victim; the trash bag in which the body of the victim was found; the contents of the lavender coat of the victim; the inventory of the items found in the lavender coat.

b. Ordering the District Attorney to produce to Plaintiff the evidence listed in paragraph(a), above.

c. Ordering the District Attorney to cooperate with the Plaintiff in selecting a qualified laboratory for testing the evidence or, in the alternative, ordering the evidence to be tested at a specific, qualified laboratory chosen by the Court;

d. Reasonable attorneys' fees and costs; and

e. Any other relief that this Court deems just and proper.

Dated: 7/23/18

By: s/ Cheryl Sturm, Esquire
Attorney I.D. No. PA40353
Attorney for Plaintiffs

Dated: 7/23/18

NEWMAN, WILLIAMS
By: s/ Gerard J. Geiger, Esquire
Attorney I.D. No. PA44099
Attorneys for Defendants