## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT MUIR WADE, | |
| Plaintiff, | CIVIL ACTION NO.  3:15-cv-00584 |
| v. | (SAPORITO, M.J.) |
| MONROE COUNTY DISTRICT ATTORNEY, et al., | |
| Defendants. | |

## MEMORANDUM

This is a federal civil rights action, brought under 42 U.S.C. § 1983. The plaintiff, Robert Muir Wade, is a state prisoner incarcerated at SCI Dallas, located in Luzerne County, Pennsylvania. He is serving a sentence of life in prison without parole. Appearing through counsel, he alleges that the defendants' failure to release certain physical evidence to him for DNA testing has violated his federal constitutional rights. He seeks an order from this Court directing the defendants to release this evidence for DNA testing, plus costs and fees.

### I.  FACTUAL BACKGROUND

By way of background only, we refer to an appellate opinion by the Superior Court of Pennsylvania, which ably summarizes the facts

underlying Wade's criminal conviction:

> [Wade] and the victim had known each other for approximately six years and had lived together at one point during their relationship. Although [Wade] was married, he and the victim had sexual relations until at least two months before the victim's death.

> As the victim did not own a vehicle, [Wade] routinely drove her to and from work. [Wade] admitted that he drove the victim to work on November 26, 1996, the day she was last seen alive. It was also confirmed that the victim made various telephone calls to [Wade] that day from her workplace. The victim had also telephoned her mother and explained that she was going to meet [Wade] after work to shop for a vehicle. Several business cards of car dealers were found in the victim's pockets. [Wade] testified that he talked to the victim at approximately 5:00 p.m., which was also the last time she was seen alive. [The victim's] body was discovered six days later, on December 2, 1996.

> On December 3, 1996, a search warrant was issued in New Jersey for [Wade's] automobile. During the search, the police found bloodstains on the back of the passenger seat. The autopsy revealed that the victim had bled from the nose and that there was a substantial amount of blood around her mouth and on the top of her turtleneck. The Commonwealth introduced evidence establishing that the blood found in the vehicle matched the victim's blood within 1 of 207,000 in the African-American population.

> In the trunk of [Wade's] automobile, the police discovered plastic shopping bags. One of these bags contained "Pathmark" brand products and a receipt from a "Pathmark" store in Montclair, New Jersey[,] dated November 26, 1996. The receipt was timed at approximately 1:25 p.m. and had the victim's name on

it. The information on the receipt was corroborated with a timed videotape depicting the victim at this store purchasing items found in the shopping bags. The victim was wearing the same clothes that she was found in when her body was discovered on December 2, 1996.

The garbage bag that the body was found in also led to evidence linking [Wade] to the crime. On December 3, 1996, [Wade's] wife consented to a search of their home. During the search, the police found clothing that belonged to the victim. [Wade's] wife gave police a garbage bag, which was identical to the bag in which the victim was found. Two days later, while executing a search of [Wade's] home on December 5, 1996, the police found a box of these particular garbage bags in the basement.

The garbage bags in this case were unusual and proved to be important circumstantial evidence. The Commonwealth presented two experts in bag manufacturing to testify about the garbage bags. Frank Ruiz, one of the experts, testified that the bag in which the body was found and the bags discovered in [Wade's] home were manufactured by the same company within the same eight hours. Tests revealed that they were institutional garbage bags, not commonly sold in the consumer market. Further, the process by which this particular garbage bag was manufactured revealed that it was extremely uncommon within the garbage bag industry.

*Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719, at *1

(Pa. Super. Ct. Mar. 20, 2013) (unpublished opinion) (brackets omitted.)

In 1998, Wade was arrested and charged with the victim's murder. *Id.* at

*2.

## II.  PROCEDURAL BACKGROUND

On April 3, 2000, following a jury trial, Wade was convicted in the Court of Common Pleas of Monroe County for first-degree murder and abuse of a corpse. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On July 18, 2000, Wade was sentenced to serve a term of mandatory life imprisonment without parole for the first-degree murder conviction and a term of 1 to 2 years imprisonment for abuse of a corpse. *Id.* His conviction and sentence were affirmed on direct appeal by the Superior Court of Pennsylvania on October 12, 2001. *Commonwealth v. Wade*, Docket No. 3406 EDA 2000 (Pa. Super. Ct.). Nearly a year later, on September 10, 2001, Wade filed a *nunc pro tunc* petition for allocatur with the Supreme Court of Pennsylvania, which was denied on December 16, 2002. *Commonwealth v. Wade*, Docket No. 208 MM 2002 (Pa.).

On June 9, 2003, Wade filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Wade v. Warden of SCI Rockview*, Case No. 4:03-cv-00952 (M.D. Pa. filed June 9, 2003). On December 2, 2004, Wade's petition was denied by this Court. *Id.* Wade filed an untimely appeal to the Third Circuit, which remanded the case for this

Court to determine in the first instance whether a certificate of appealability should issue. *Id.* On February 7, 2006, this Court declined to issue a certificate of appealability. *Id.* On December 21, 2006, the Third Circuit likewise denied Wade's request for a certificate of appealability. *Id.*

In the meantime, Wade filed a *pro se* PCRA petition in the state trial court on August 23, 2004. Counsel was appointed thereafter to represent Wade in the PCRA proceedings. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On February 7, 2005, the PCRA court denied Wade's PCRA petition as untimely filed. *Id.* The denial of this first PCRA petition was affirmed on appeal by the Superior Court on August 22, 2005. *Commonwealth v. Wade*, 885 A.2d 587 (Pa. Super. Ct. 2005) (table decision) (No. 586 EDA 2005).

On or about September 1, 2005, Wade submitted a *pro se* motion for post-conviction DNA testing for filing in the state trial court. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). Because he was represented by counsel of record, the trial court forwarded the motion to his attorney without docketing or recording it, as required under state rules of civil procedure. *Id.*

On or about May 8, 2006, Wade filed a second *pro se* PCRA petition, which was denied by the PCRA court on May 9, 2006, as having been previously litigated, and therefore barred from further review. *Id.* The denial of this second PCRA petition was affirmed on appeal by the Superior Court on November 9, 2006. *Commonwealth v. Wade*, 915 A.2d 152 (Pa. Super. Ct. 2006) (table decision) (No. 1372 EDA 2006).

On or about June 12, 2006, Wade filed a second *pro se* motion for post-conviction DNA testing. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). In this motion, Wade sought testing of the following evidence: (1) blood stains collected from Wade's vehicle; (2) any semen found on the victim; (3) finger and palm print analysis of latent prints on the garbage bag in which the victim's body was found; (4) hairs found on the passenger-side floor mats that were microscopically compared to the victim's hair and found to be similar; (5) hairs found on the driver-side rear floor; and (6) other hairs found in the vehicle that were not suitable for comparison. On December 4, 2006, the state trial court notified Wade of its intention to deny the petition on multiple grounds. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). On December 27, 2006, the state

trial court denied the motion for the stated reasons that Wade failed to meet the requirements for post-conviction DNA testing of evidence that was available prior to trial, and that there was no reasonable probability that testing would produce favorable results that would establish his actual innocence of the offense for which he was convicted. The denial of this second motion for DNA testing was affirmed on appeal by the Superior Court on December 10, 2007. *Commonwealth v. Wade*, 945 A.2d 771 (Pa. Super. Ct. 2007) (table decision) (No. 190 EDA 2007). In particular, the Superior Court agreed with the trial court that the requested DNA testing, regardless of its results, would not have demonstrated Wade's actual innocence. Four months later, on or about April 2, 2008, Wade filed a *nunc pro tunc* petition for allocatur with the Supreme Court of Pennsylvania, which was denied on September 2, 2008. *Commonwealth v. Wade*, Docket No. 80 MM 2008 (Pa.).

On December 9, 2011, Wade filed his third motion for post-conviction DNA testing, this time appearing through counsel. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). This third motion sought additional testing not requested in the second motion for DNA testing, including the following evidence: (1)

the fingernails of the victim and any scrapings from those fingernails; (2) the victim's yellow turtleneck sweater, which had blood stains on it; (3) the victim's leather coat, bra, underpants, pantyhose, and shoes; (4) the trash bag in which the victim's body was found;[1] and (5) the contents of the victim's coat, which were removed and inventoried by police investigators. On March 21, 2012, Wade filed a supplement to his third motion for DNA testing, requesting that these same pieces of evidence be tested for "touch DNA," using new testing technologies not previously available. On June 15, 2012, the state PCRA court denied the motion. *Commonwealth v. Wade*, Docket No. CP-45-CR-0000639-1998 (Monroe Cty. C.C.P.). In denying his motion, the PCRA court considered the evidence presented at trial and the particular testing requested, and it found that there was no reasonable probability that testing would produce favorable results that would establish his actual innocence of the offense for which he was convicted. The denial of this third motion for DNA testing was affirmed on appeal by the Superior Court on March 20, 2013. *Commonwealth v. Wade*, 69 A.3d 1297 (Pa. Super. Ct. 2013) (table

---

[1] While the second motion requested forensic analysis of the trash bag, it did not request DNA testing.

decision); *Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719 (Pa. Super. Ct. Mar. 20, 2013) (unpublished opinion). In affirming the PCRA court decision, the Superior Court found that, in light of the evidence presented at trial,

> even assuming DNA testing would reveal DNA from someone other than [Wade] or the victim on the multiple items [Wade] seeks to have tested, [Wade] does not demonstrate it is more likely than not that no reasonable juror confronted with the DNA and other evidence would find [Wade] guilty beyond a reasonable doubt.

*Wade*, 2013 WL 11273719, at *3. Wade filed a timely petition for allocatur with the Supreme Court of Pennsylvania, which was denied on November 15, 2013. *Commonwealth v. Wade*, 80 A.3d 777 (Pa. 2013) (table decision) (No. 277 MAL 2013).

Appearing through counsel, Wade filed his original complaint in this action on March 24, 2015. (Doc. 1.) The original complaint named three defendants: (a) the Monroe County District Attorney's Office; (b) the Commonwealth of Pennsylvania; and (c) E. David Christine, District Attorney for Monroe County, sued in his official capacity only. (*Id.*) Wade seeks injunctive relief only. (*Id.*)

On April 18, 2015, the defendants filed their answer to the

complaint. (Doc. 6.) On August 5, 2015, Wade moved for leave to amend his complaint to eliminate the Commonwealth of Pennsylvania as a defendant to the action based on its immunity from suit under the Eleventh Amendment to the United States Constitution. (Doc. 7.) On August 10, 2015, the Court granted Wade's motion, and the Commonwealth was terminated as a defendant to this action. (Doc. 9.)

On October 14, 2016, following the exchange of discovery, the remaining defendants filed a motion for summary judgment, together with a statement of material facts and a brief in support. (Doc. 20; Doc. 21; Doc. 22.) On November 4, 2016, Wade filed his answer to the statement of facts, together with several documentary exhibits and a brief in opposition to summary judgment. (Doc. 23; Doc. 24.) On September 29, 2017, we denied the defendants' motion for summary judgment and dismissed three of the five counts of the plaintiff's complaint *sua sponte* for failure to state a claim. (Doc. 25; Doc. 26.)

On January 10, 2018, the plaintiff filed a motion for summary judgment with respect to the two remaining counts, together with a statement of material facts and a brief in support. (Doc. 32; Doc. 33; Doc. 34.) On January 31, 2018, the defendants filed their answer to the

statement of facts, together with a brief in opposition to summary judgment. (Doc. 36; Doc. 37.) On February 14, 2018, the plaintiff filed a reply brief in support of summary judgment. (Doc. 40.) On June 15, 2018, we denied the plaintiff's motion for summary judgment. (Doc. 42; Doc. 43.)

By agreement of the parties, the case was submitted for a bench trial on the papers under Rule 52(a) of the Federal Rules of Civil Procedure. *See generally Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001); *May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1116 (7th Cir. 1986). In addition to a joint stipulation of facts (Doc. 48), both sides submitted legal briefs in support of their positions (Doc. 49; Doc. 50), and a hearing was conducted by the Court to receive oral argument from counsel for both sides. (Doc. 51 (minute sheet); Doc. 53 (stenographic transcript).)

## III.  FINDINGS OF FACT

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, we adopt the joint stipulation of facts submitted by the parties and make the following findings of fact in this matter:[2]

---

[2] We have renumbered paragraphs, corrected typographical errors,

1.      On December 2, 1996, hunters discovered the body of Lekitha Council partially enveloped in a garbage bag in a rural area of Pocono Township, Monroe County, Pennsylvania.

2.      Dr. Isidore Mihalakis, a forensic pathology expert, conducted the autopsy and concluded that Council was the victim of homicide by manual strangulation or suffocation.

3.      Dr. Mihalakis testified at Wade's criminal trial that Council had been dead for three to five days at most.

4.      Robert Muir Wade was charged with the murder.

5.      The following evidence was presented by the Commonwealth at Wade's criminal jury trial before the Monroe County Court of Common Pleas:

<u>Evidence Leading Up to Council's Death</u>

6.      Wade and Council knew each other for approximately six years and had lived together at one point during their relationship.

7.      Although Wade was married, he and Council had sexual relations until at least two months before Council's death.

---

and made some stylistic, non-substantive modifications. Otherwise, we have largely adopted the joint stipulation of facts verbatim.

8.     Wade routinely drove Council to and from work because she did not own a vehicle.

9.     Wade admitted he drove Council to work on November 26, 1996, the last day she was seen alive.

10.     Council made various telephone calls to Wade that day from her workplace.

11.     Council had also telephoned her mother and explained that she was going to meet Wade after work to shop for a vehicle.

12.     Several business cards of car dealers were found in Council's pockets. Wade testified that he talked to Council at approximately 5:00 p.m., which was also the last time she was seen alive.

13.     Council's body was discovered six days later, on December 2, 1996.

### Blood in Wade's Car

14.     On December 3, 1996, a search warrant was issued in New Jersey for Wade's car.

15.     During the search, the police found bloodstains on the back of the passenger seat.

16.     The autopsy revealed that Council had bled from the nose and

that there was a substantial amount of blood around her mouth and on the top of her turtleneck.

17.     The Commonwealth introduced evidence establishing that the blood found in the vehicle matched Council's blood within 1 of 207,000 in the African-American population.

Pathmark Shopping Bags

18.     The police discovered plastic shopping bags in the trunk of Wade's car.

19.     One of these bags contained "Pathmark" brand products and a receipt from a "Pathmark" store in Montclair, New Jersey, dated November 26, 1996.

20.     The receipt was time-stamped at approximately 1:25 p.m. and had Council's name on it.

21.     The information on the receipt was corroborated with a timed videotape depicting Council at this store purchasing items found in the shopping bags.

22.     Council was wearing the same clothes she was found in when her body was discovered on December 2, 1996.

23.     Evidence was introduced at trial that Wade was familiar with

the area in which the body was found.

24.    Specifically, the Commonwealth established that Wade had stayed at the Caesar's Brookdale Resort in July 1996. This resort was within a few miles of where the body was found. The body was found near Route 314. Evidence was introduced that Dyson Road directly linked Caesar's Brookdale to Route 314. Dyson Road is located 30-40 yards south of where the body was found.

25.    Council's mother testified at trial that, considering the nature and 6-year length of the relationship between Wade and Council, she considered it "strange" that when informed of Council's death, Wade did not ask for any details.

26.    The Commonwealth tested the trash bag in which Ms. Council's body was found. The test did not find the DNA of Mr. Wade but did detect the DNA of another individual. The bag was also tested for fingerprints. No fingerprints of Mr. Wade were found but the fingerprints of another individual were found on the bag.

<u>Council's Clothing Was in Wade's Home</u>

27.    On December 3, 1996, Wade's wife consented to a search of their home.

28.     During the search, the police found clothing that belonged to Council.

Unique Garbage Bags

29.     Wade's wife gave police a garbage bag, which was identical to the bag in which the victim was found.

30.     On December 5, 1996, while executing a search of Wade's home, the police found a box of these particular garbage bags in the basement.

31.     The garbage bags in this case were unique.

32.     The Commonwealth presented two experts in bag manufacturing to testify about the garbage bags:

    a. Frank Ruiz, one of the experts, testified that the bag in which the body was found and the bags discovered in Wade's home were manufactured by the same company within the same eight hours.

    b. Tests revealed that the bags were institutional garbage bags, not commonly sold in the consumer market.

    c. Further, the process by which this particular garbage bag was manufactured revealed that it was extremely

uncommon within the garbage bag industry.

<u>The Defense</u>

33.    The defense established that Ms. Council had a key to Wade's car.

34.    Security cameras did not reveal that Mr. Wade left work early. According to the time clock kept by Cunningham Graphics where Mr. Wade worked full-time, Mr. Wade punched in at 3:00 p.m. and punched out at 11:00 p.m. on November 26th and punched in at 3:00 and out at 11:32 p.m. on November 27th.

35.    The defense introduced a credit card receipt indicating that Mr. Wade purchased gas at 1:40 p.m. on November 26, 1996, in Plainfield, New Jersey.

36.    Although on the day she disappeared, Ms. Council was seen at a Pathmark at 1:25 p.m. buying food items that were found in the trunk of Mr. Wade's vehicle, after purchasing those items, Ms. Council returned to her place of employment and her co-workers saw her leaving at 5 P.M.

37.    Ms. Council called Mr. Wade at his place of employment at 5 P.M.

38.    Ms. Council's mother believed that she was away with a man other than Mr. Wade and did not report her missing.

39.    The Commonwealth tested the trash bag in which Ms. Council's body was found. The test did not find the DNA of Mr. Wade but did detect the DNA of another individual. The bag was also tested for fingerprints. No fingerprints of Mr. Wade were found but the fingerprints of another individual were found on the bag.

## Criminal Trial Conviction

40.    In 2000, a jury convicted Wade of first-degree murder, 18 Pa. Cons. Stat. Ann. § 2502(a), and abuse of a corpse, 18 Pa. Cons. Stat. Ann. § 5510.

41.    On July 18, 2000, Wade was sentenced to mandatory life in prison for first-degree murder, and a concurrent term of 1-2 years' imprisonment for abuse of a corpse.

## Wade's Challenges to His Conviction

42.    Wade appealed his conviction and sentence to the Pennsylvania Superior Court, which affirmed the judgment of sentence on October 12, 2001. *Commonwealth v. Wade*, 790 A.2d 344 (Pa. Super. Ct. 2001) (unpublished table decision).

43. The Pennsylvania Supreme Court denied Wade's petition for leave to file a petition for allowance of appeal *nunc pro tunc* on December 16, 2002. *Commonwealth v. Wade*, Docket No. 208 MM 2002 (Pa.).

44. On August 23, 2004, Wade filed his first petition under the Post-Conviction Relief Act ("PCRA").

45. The PCRA court appointed counsel and later dismissed the PCRA petition as untimely. The Superior Court affirmed this dismissal in 2005. *Commonwealth v. Wade*, 885 A.2d 587 (Pa. Super. Ct. 2005) (unpublished table decision).

46. On May 8, 2006, Wade filed his second PCRA petition, requesting DNA testing. The PCRA court denied relief on the ground that the petition was "untimely." The Superior Court affirmed the denial of Wade's second PCRA petition. *Commonwealth v. Wade*, 915 A.2d 152 (Pa. Super. Ct. 2006) (unpublished table decision).

<u>Wade's DNA Testing Requests</u>

47. On September 9, 2005, Wade filed a pro se motion for post-conviction DNA testing and preservation of certain evidence. The Court ordered that the *pro se* motion be forwarded to Wade's attorney.

48. On May 8, 2006, Mr. Wade filed a second PCRA petition

requesting DNA testing. On May 9, 2006, the Common Pleas judge dismissed it as "untimely." While his appeal was pending, on June 12, 2006, Mr. Wade resubmitted his motion for DNA testing.

49.    On November 9, 2006, the Superior Court affirmed the denial of Mr. Wade's second PCRA petition. *Commonwealth v. Wade*, 915 A.2d 152 (Pa. Super. Ct. 2006) (unpublished table decision).

50.    On December 4, 2006, the trial judge filed a notice of disposition without a hearing stating that Mr. Wade was not entitled to DNA testing.

51.    Mr. Wade had requested DNA testing of the following items:

- Blood stains collected from Wade's vehicle;

- Any semen found on the victim;

- Finger and palm print analysis of latent prints on the garbage bag in which the victim's body was found;

- Hairs found on the passenger side floor mats that were microscopically compared to the victim's hair and found to be similar;

- Hairs found on the driver's side rear floor; and

- Other hairs found in the vehicle which were not suitable

for comparison.

52.     On December 27, 2006, the trial court filed an Opinion and Order denying the motion for post-conviction DNA testing and other outstanding motions.

53.     On December 10, 2007, the Superior Court affirmed. The Superior Court did not reach the question of whether Mr. Wade's Motion for post-conviction DNA testing was timely filed. Instead, the Superior Court affirmed denial of the motion because it concluded that the DNA testing of the items identified in Wade's motion would not have established Mr. Wade's actual innocence.

54.     According to the PCRA court's opinion filed June 12, 2012, Mr. Wade filed a second *pro se* motion for post-conviction DNA testing and preservation of certain evidence on December 27, 2006. This motion was denied by Order dated January 2, 2007. The Superior Court affirmed denial of the request for DNA testing on December 10, 2007.

55.     On December 9, 2011, Mr. Wade filed his third motion for post-conviction DNA testing. In that motion, Mr. Wade requested DNA testing of the following items:

        a. The fingernails of the victim and any scrapings from those

fingernails;

b. The yellow turtleneck sweater worn by the victim, which had a blood stain at the neck and on the body of the sweater, and the lavender leather coat, bra, underpants, pantyhose, and shoes of the victim;

c. The trash bag in which the body of the victim was found; and

d. The contents of the lavender coat of the victim.

56.   Those items of evidence continue to exist and have not been subjected to DNA testing and had never been subjected to DNA testing. The items are in the possession of the Pennsylvania State Police.

57.   Mr. Wade filed a supplemental motion for DNA testing on March 21, 2012. In the supplemental motion, he requested that the items enumerated in paragraph 55 be subjected to the new technology of "touch" DNA testing.

58.   On March 22, 2012, the court held a hearing limited to argument on the motion and supplemental motion. Mr. Wade filed a supplemental memorandum of law in support of his motion on April 19, 2012. In the supplemental memorandum, Mr. Wade requested that the

DNA testing be done at the Commonwealth's expense and that the results of the DNA testing be sent for inclusion in CODIS for comparison with that database, and that they should be loaded into the Pennsylvania and federal DNA databases for testing.

59. "CODIS" is a computer software program that operates local, state, and national databases of DNA profiles from convicted offenders, unsolved crime evidence, and missing persons.

60. On June 15, 2012, the court entered an order denying Mr. Wade's third petition for DNA testing and supplemental motion for touch DNA testing and filed an opinion. In the opinion, the PCRA court recognized that "touch DNA testing is a new technology that has become available since [Wade]'s trial in 2000; however, we note that this new technology was available in 2003, three years before [Wade]'s last (second) request for DNA testing and 8 years prior to the present motion. Thus, we do not believe the present motion was filed in a timely manner." In the alternative, the PCRA court found, erroneously, that some of the items that were the subject of Mr. Wade's motion for DNA testing and supplemental motion for DNA testing had already been subjected to DNA testing.

61.    The forensic records and the trial testimony of the forensic scientist at the Pennsylvania State Police DNA crime lab established that DNA tests were performed on four items only: K-1 (alcohol patches of the victim's blood), Q-1 (a cotton patch with a stain), Q-2 (a control sample), Q-3 (a piece of leather with a stain), and Q-4 (an unused cotton patch used to make Q-1).

62.    The only DNA testing done was to match the victim's blood to a small spot of blood on the seat of Mr. Wade's automobile. The DNA scientist specifically testified she was *not* provided with "any additional samples of anything else to test [relating to] the case."

63.    The PCRA judge's conclusion that the pieces of evidence Mr. Wade requested be subjected to DNA testing had previously been tested is contrary to the record.

64.    Mr. Wade filed a timely notice of appeal. On March 20, 2013, the Pennsylvania Superior Court affirmed and on November 15, 2013, the Pennsylvania Supreme Court denied a petition for allowance of appeal.

65.    Wade has maintained and continues to maintain that he is actually innocent.

66.    On June 9, 2003, Mr. Wade filed a counseled petition for habeas corpus with the United States District Court for the Middle District of Pennsylvania, docket number 4:03-cv-00952-JEJ.

67.    The Court denied the petition on December 2, 2004.

68.    On December 20, 2006, the United States Court of Appeals for the Third Circuit denied an application for a certificate of appealability.

Section 1983 Action

69.    Wade filed this Section 1983 action on March 24, 2015, asking for the following relief:

a. Ordering the district attorney to take all steps reasonably necessary to preserve: the physical evidence taken from the victim's body, including fingernails of the victim and any scrapings from those fingernails; the yellow turtleneck sweater worn by the victim and which had a bloodstain on the neck and body of the sweater; the lavender leather coat; the bra, underpants, pantyhose, and shoes of the victim; the trash bag in which the body of the victim was found; the contents of the lavender coat of the victim; and the

inventory of the items found in the lavender coat;

b. Ordering the district attorney to produce to the plaintiff the evidence listed in paragraph 69(a) above;

c. Ordering the district attorney to cooperate with the plaintiff in selecting a qualified laboratory for testing the evidence or, in the alternative, ordering the evidence to be tested at a specific, qualified laboratory chosen by the Court;

d. Reasonable attorneys' fees and costs; and

e. Any other relief that this Court deems just and proper.

In addition to the foregoing, we have taken judicial notice of the state PCRA court's order and opinion of June 15, 2012, denying Wade's third motion for post-conviction DNA testing and his supplemental motion for touch DNA testing (Doc. 23-2, at 4–15), and the Superior Court's appellate opinion affirming the PCRA court's denial of those motions, *Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719 (Pa. Super. Ct. Mar. 20, 2013).

## IV. CONCLUSIONS OF LAW

The complaint in this action originally contained five separate

counts, all brought pursuant to 28 U.S.C. § 1983. *See generally Grief v. Klem*, 591 F.3d 672, 678 (3d Cir. 2010) ("[A] plaintiff can use the § 1983 vehicle to request the release of evidence for postconviction DNA analysis."). Counts III, IV, and V were previously dismissed for failure to state a claim. *See generally Wade v. Monroe Cty. Dist. Attorney*, Civil Action No. 3:15-cv-00584, 2017 WL 4413195 (M.D. Pa. Sept. 29, 2017). Two counts remain. In Count I, Wade claims that the defendants' refusal to release physical evidence from his criminal case to him for DNA testing was a violation of his procedural due process rights under the Fourteenth Amendment. In Count II, Wade claims that the defendants' refusal to release the physical evidence to him for DNA analysis was a violation of his right to meaningful access to the courts under the First and Fourteenth Amendments.

## A. Fourteenth Amendment Procedural Due Process Claim

Wade contends that the defendants have violated—and continue to violate—his procedural due process rights under the Fourteenth Amendment to the United States Constitution, which guarantees fair procedure for the deprivation of a constitutionally protected interest in life, liberty, or property. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

Although the federal constitution does not provide a freestanding substantive due process right to DNA evidence, the Supreme Court has held that a convicted prisoner may have a constitutionally protected liberty interest in demonstrating his innocence with new evidence under state law. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68, 72 (2009); *see also Skinner v. Switzer*, 562 U.S. 521, 525 (2011). "This 'state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" *Osborne*, 557 U.S. at 68.

Here, as in *Osborne*, we find that Wade has an analogous state-created liberty interest in demonstrating his innocence in the context of post-conviction proceedings with appropriate evidence. *See Wagner v. Dist. Attorney Allegheny Cty.*, Civil Action No. 11-762, 2012 WL 290093, at *8 (W.D. Pa. May 21, 2012); *Grier v. Klem*, Civil Action No. 05-05 Erie, 2011 WL 4971925, at *7 (W.D. Pa. Sept. 19, 2011), *report and recommendation adopted by* 2011 WL 5008326 (W.D. Pa. Oct. 19, 2011). Thus, the question is whether, as applied to him, the state procedures for post-conviction DNA testing violated Wade's procedural due process rights. *See Wagner*, 2012 WL 2090093, at *8; *Grier*, 2011 WL 4971925, at

*7.

A post-conviction prisoner's procedural due process rights with respect to the disclosure of potentially exculpatory evidence are more limited than those of a pre-conviction criminal defendant. As the Supreme Court has explained:

> A criminal defendant proved guilty after a fair trial does not have the same liberty interest as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond a reasonable doubt. But once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.

> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. When a State chooses to offer help to those seeking relief from convictions, due process does not dictate the exact form such assistance must assume. [A postconviction prisoner's] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. . . .

> Instead, the question is whether consideration of [the prisoner's] claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental

fairness in operation. Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

*Osborne*, 557 U.S. at 68–69 (cleaned up). Moreover, it is the plaintiff's "burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief." *Id.* at 71.

Pennsylvania has enacted a post-conviction DNA testing statute, 42 Pa. Cons. Stat. Ann. § 9543.1, which permits a convicted prisoner to make a written motion in the sentencing court for the performance of forensic DNA testing on specific evidence related to the investigation or prosecution that led to his conviction. *Id.* § 9543.1(a)(1).

> The statute sets forth several threshold requirements to obtain DNA testing: (1) the evidence specified must be available for testing on the date of the motion; (2) if the evidence was discovered prior to the applicant's conviction, it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because his client was indigent, and the court refused the request despite the client's indigency.

*Wagner*, 2012 WL 2090093, at *10 (citing 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2)).

Once these threshold requirements are met, the statute requires the petitioner to present a *prima facie* case demonstrating that (1) the identity of the perpetrator was at issue at trial, and (2) DNA testing of the specified evidence, *assuming exculpatory results*, would establish the applicant's actual innocence of the crime for which he was convicted. 42 Pa. Cons. Stat. Ann. § 9543.1(c)(3). The statute further provides that "[t]he court shall not order the testing requested . . . if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that . . . would establish the applicant's actual innocence of the offense for which the applicant was convicted." *Id.* § 9543.1(d)(2). The statute itself does not define the term "actual innocence," but Pennsylvania state courts have adopted the definition of "actual innocence" articulated by the Supreme Court of the United States in *Schlup v. Delo*, 513 U.S. 298 (1995): "namely, that the newly discovered evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'" *Commonwealth v. Conway*, 14 A.3d 101, 109 (Pa. Super. Ct. 2011) (quoting *Schlup*, 513 U.S. at 327); *see also In re Payne*, 129 A.3d 546, 556

(Pa. Super. Ct. 2015) (quoting *Conway*, 14 A.3d at 109). Under the statute, "the burden lies with the petitioner to make a *prima facie* case that favorable results from the requested DNA testing would establish his innocence." *Wagner*, 2012 WL 2090093, at \*10.

Here, Wade filed a motion in the state PCRA court for post-conviction DNA testing of several items of evidence: fingernail clippings from the victim and scrapings taken from those fingernails; a trash bag that partially covered the body of the victim; a yellow sweater, lavender leather coat, bra, underpants, pantyhose, and shoes worn by the victim when her body was recovered; and contents recovered from the pockets of the leather coat. In support, he noted that his identity as the perpetrator had been at issue at trial, and that he had been convicted on circumstantial evidence. He noted that security camera footage, payroll timeclock records, and a credit card receipt were admitted in support of an alibi defense—Wade contended at trial that he had been at work in New Jersey at the time of the victim's death. He further noted that fingerprints and palm prints that did not belong to Wade were found on the trash bag, and that the victim's sweater was on backwards when she

was found, suggesting that she had been redressed by her assailant.[3] He postulated that testing of the specified evidence for "touch DNA"—a technology not available at the time of trial—might reveal a source other than Wade and the victim, which would constitute a *prima facie* case that someone other than Wade murdered the victim.

Relying on *Conway*, Wade has advanced three separate theories under which DNA testing of the specified evidence, assuming exculpatory results, might establish his actual innocence of the crime for which he was convicted. As described by the *Conway* court, these three theories are:

> (1) a "redundancy" theory, which postulates that if the individual DNA tests reveal evidence of a third person on multiple items connected with the crime, then those "redundant" results would give rise to an inference of a separate assailant; (2) a "data bank" theory, which postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant; and (3) a "confession" theory, which postulates that an assailant who is discovered by using the data bank theory could, when confronted with the DNA evidence, confess to the crime.

---

[3] We also note that her pantyhose and underpants were pulled down to her ankles when she was found.

*Conway*, 14 A.3d at 110. In *Conway*, the state appellate court weighed these theories against the evidence presented at trial, noting that the evidence at trial was "wholly circumstantial," that there had been no prior history between the defendant and the victim, and that the victim's hands were bound and her clothing ripped in a manner that indicated "extensive contact" with the hands of her assailant. *Id.* at 112. The state appellate court ultimately found that, based on these facts, the plaintiff had satisfied his burden of demonstrating a *prima facie* case that the requested DNA evidence, assuming exculpatory results, would establish his actual innocence. *Id.* at 114.

In Wade's case, the state PCRA court denied his motion, articulating three alternative grounds for its decision. First, the PCRA court *sua sponte* found Wade's motion to be untimely, noting that, while "touch DNA" technology was not yet available at the time of trial, it had been available since 2003, and "[a]lthough the statute does not state what constitutes 'a timely manner' for filing of a DNA motion, we do not believe that a delay of eight years from the time the new technology became available constitutes 'a timely manner' for filing a DNA motion." (Doc.

23-2, at 9).[4]

Second, the PCRA court summarized the trial evidence at issue:[5]

---

[4] The post-conviction DNA testing statute provides that the PCRA court should determine whether the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." 42 Pa. Cons. Stat. Ann. § 9543.1(d)(1)(iii). The statute does not define "timely manner," and Pennsylvania courts have mostly sidestepped the timeliness issue, leaving this provision generally undefined. *See Commonwealth v. Edmiston*, 65 A.3d 339, 356 (Pa. 2013) ("Other that a Superior Court panel's observation that 'Section 9543.1 places no time limits on motions for DNA testing,' Pennsylvania courts have not otherwise construed the requirement of timeliness in this context."). In *Edmiston*, the Supreme Court of Pennsylvania addressed the statute's timeliness requirement as a matter of first impression, finding a motion for DNA testing to be untimely filed where the movant knew of the existence of the evidence at issue for more than twenty years and had been represented by counsel in post-conviction proceedings throughout the entire period since his trial. *Id.* at 357. The *Edmiston* court further noted that the DNA motion was only filed as PCRA proceedings were coming to their conclusion, and it had the effect of delaying execution of the movant's death sentence. *Id.* at 358. It should also be noted that the timeliness issue in *Edmiston* had been expressly preserved by the Commonwealth's objection in the PCRA court. *See Payne*, 129 A.3d at 555 n.12 (discussing *Edmiston* and noting that the appellate court could not raise the non-jurisdictional timeliness issue *sua sponte* in *Payne* as it had been waived by the Commonwealth in PCRA proceedings below). In this case, the Commonwealth's brief in the PCRA court opposed the motion on its merits only, and the Superior Court subsequently affirmed on the merits, without discussing timeliness. *See Wade*, 2013 WL 11273719, at *3 n.4.

[5] We note that the PCRA court characterized this as "DNA evidence presented to the jury," but it appears from the state court records that a blood-stained swatch of leather from the back seat of Wade's automobile was the only evidence subjected to pre-trial DNA testing—the blood was

(1) *Yellow Turtleneck Sweater*: the blood on the front (actually the back) of the sweater was identified as belonging to the victim. The sweater was also tested for fibers. []Three head hairs found on the sweater exhibited similar characteristics to the victim's hair. Black fibers that were also found on the sweater were similar to the black fibers comprising the collar and cuff of the victim's leather coat.

(2) *Fingernails of Victim & Scrapings*: The fingernails of the victim were extremely long (1 to 1-1/2 inches in length) and showed no signs of damage. Fibers found under the fingernails of victim's left hand were found to be the same type of fibers comprising the collar and cuffs of victim's coat. Nothing else was found in or about the nails of the victim and nothing of probative value was found in the bags used to cover victim's right and left hands prior to removing the body from scene.

(3) *Prints on Garbage Bag that Victim was found in*: Fingerprints and palm prints found on the garbage bag that were identified as belonging to George Surma, Forensic Scientist at the Pennsylvania State Police Crime Lab in Wyoming. There were eight prints in all; four sets of fingerprints and four palm prints. The remaining four prints (palm prints) lacked sufficient detail or characteristics to identify to anybody.

(4) *Fibers on Garbage Bag that Victim was found in*: The garbage bag in which victim's body was found was checked for fibers, as well as for any other significant

---

identified as that of the victim. (*See* Doc. 23-2, at 76–78, 89, 159–74; Doc. 48 ¶¶ 52–53.) The remainder of the evidence appears to have been examined using other forensic laboratory methods, such as serology blood tests and microscopic fiber comparisons. (*See* Doc. 23-2, at 34–38, 63–66, 69–71, 77.) Both parties have stipulated that the PCRA court's finding on this point was "erroneous[]" and "contrary to the record." (Doc. 48 ¶¶ 51, 54.)

evidence such as blood or body fluids. Nothing was found.

(5) *Underwear and Pantyhose*: The underwear and pantyhose of the victim were tested for seminal matters (combination of sperm cells and seminal fluid) and nothing was found. Also, no fibers were found on the pantyhose or underwear. Similarly, no fibers were found on the purple head band (except victim's hairs) or the flower patterned bra.

(6) None of the fibers collected from various areas of [Wade's] car and trunk were similar to the fibers comprising the victim's clothing.

(Doc. 23-2, at 12–13 (citations omitted)).

Based on this, the PCRA court then found *sua sponte* that Wade failed to satisfy the statute's threshold requirement that the specified evidence had not already been DNA tested because the technology to do so did not exist at the time of trial. *See* 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2).[6] In particular, the PCRA court acknowledged that "touch DNA" technology was not yet available at the time of trial in 2000, but found that the specified evidence had already "undergone a thorough

---

[6] The PCRA court also noted that Wade's criminal case went to verdict after January 1, 1995, and defense counsel had not requested and been refused court funding for DNA testing despite the client's indigency, and therefore the other two alternative threshold requirements had not been met. *See* 42 Pa. Cons. Stat. Ann. § 9543.1(a)(2).

DNA analysis on fibers, hair and blood[,] and none of [Wade's] DNA was found on any of the items tested." (Doc. 23-2, at 13–14).[7]

Third and finally, the PCRA court found that Wade had failed to present a *prima facie* case that he was actually innocent. The PCRA court explained:

> [W]e find that [Wade's] assertion that the results of Touch DNA analysis of the specified evidence, assuming exculpatory results, will establish his actual innocence of the murder of Lekitha Council, is speculative and irrelevant. [Wade] makes a bald assertion that touch DNA will be recovered from the items of evidence and that when subjected to the standard DNA processing (PCR analysis) the results will show the existence of someone other than [Wade]. [Wade's] argument is speculative and he offers no evidence to support this bald assertion. The Superior Court in [*Commonwealth v.*] *Smith*[, 889 A.2d 582 (Pa. Super. Ct. 2005),] held that in the face of such speculation, the absence of a

_____

[7] *But see supra* note 5. Moreover, we note that Wade's third motion for DNA testing sought touch DNA analysis not to demonstrate the *absence* of his DNA where it might be expected to be found if he were the assailant, but to determine if epithelial (skin) cells—not visible to the naked eye and not amenable to earlier, less sophisticated DNA testing methods—from a previously unidentified third-party might be found on the specified evidence in locations and in quantities suggestive of an assailant other than Wade. *See, e.g.*, *Payne*, 129 A.3d at 560–62. The Commonwealth's brief in the PCRA court opposed the motion only on the ground that Wade had failed to make a *prima facie* case that exculpatory DNA testing results would establish his actual innocence (Doc. 23-2, at 148–49), and the Superior Court subsequently affirmed on this ground, without discussing the statutory threshold requirements, *see Wade*, 2013 WL 11273719, at *3 n.4.

defendant's DNA cannot be meaningful and cannot establish a defendant's actual innocence of the murder. The Court stated that "The statute does not contemplate the speculative type of argument advanced by appellant. . ." *Smith*, [889 A.2d] at 586. In the present case, there was no evidence presented at trial the [Wade's] DNA was found anywhere on the victim, on her clothes or on the garbage bag that the victim's body was found in. In fact, the jury heard substantial evidence regarding the absence of [Wade's] DNA. Accordingly, [Wade's] request for general DNA and Touch DNA testing of the finger nails of the victim and any scrapings from those fingernails; the yellow turtleneck sweater; the lavender leather coat; the victim's bra, underpants, pantyhose and shoes; the trash bag in which the body of Lekitha Counsel was found; and the contents of the lavender coat of the victim is denied.

(Doc. 23-2, at 14–15). The PCRA court further noted that it had previously found, in earlier post-conviction proceedings, that Wade's conviction had been supported by "overwhelming" evidence, and the Superior Court of Pennsylvania had subsequently affirmed that decision. (*Id.* at 15). As a result of all of this, the PCRA court concluded that "there is no reasonable possibility that the DNA testing requested would produce exculpatory evidence that would establish [Wade's] actual innocence of the crimes for which he was convicted." (*Id.*).

On appeal, it was upon this third basis that the appellate court affirmed the PCRA court's denial of Wade's motion for post-conviction

DNA testing. *See Commonwealth v. Wade*, No. 2041 EDA 2012, 2013 WL 11273719, at *3 (Pa. Super. Ct. Mar. 20, 2013). The appellate court declined to address the alternative grounds for dismissal articulated by the PCRA court—timeliness and whether the specified evidence had not been DNA-tested because the technology to do so did not exist at the time of trial. *See id.* at *3 n.4. Wade filed a timely petition for allocatur with the Supreme Court of Pennsylvania, which was summarily denied. *Commonwealth v. Wade*, 80 A.3d 777 (Pa. 2013) (table decision) (No. 277 MAL 2013).

The parties have spent much of their time in this federal litigation debating whether the state courts' decisions were legally and factually correct under state law—i.e., whether the motion was timely (a moot point, in light of the Superior Court's affirmance on the merits), whether the specified evidence had been previously subjected to DNA testing (also a moot point), and whether DNA testing of the specified evidence, assuming exculpatory results, would establish Wade's actual innocence of the crimes for which he was convicted. But under the *Rooker-Feldman* doctrine, we lack jurisdiction to review the state court decisions themselves for legal error. *See Exxon Mobil Corp. v. Saudi Basic Indus.*

*Corp.*, 544 U.S. 280, 284 (2005); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010); *FOCUS v. Allegheny Cty. Ct. Com. Pl.*, 75 F.3d 834, 840 (3d Cir. 1996).

The question properly before us is a narrow one: Whether the Pennsylvania post-conviction DNA testing statute, as construed by the state courts in Wade's case, "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69; *see also Wagner*, 2012 WL 2090093, at *15. On their face, Pennsylvania's procedures for post-conviction DNA testing do not. *See Wagner*, 2012 WL 2090093, at *15; *see also Osborne*, 557 U.S. at 69–70. Under these procedures, Wade had the opportunity to file a motion for post-conviction DNA testing and did so.[8] He was represented by counsel. He was afforded a hearing before the

---

[8] Notably, he was not barred by a *per se* procedural rule, *cf. Grier*, 2011 WL 4971925, at *8–*9 (finding *per se* rule "[p]rohibiting defendants who have confessed to a crime from accessing DNA evidence after conviction violates the concept of fundamental fairness"), but instead his motion was denied on the merits. Although the PCRA court articulated untimeliness as one of the alternative grounds for dismissal, the PCRA court also addressed Wade's motion on its merits, and the Superior Court addressed his appeal exclusively on the merits, declining to address the timeliness issue at all.

PCRA court. He was provided with a reasoned decision by the PCRA court when it denied his motion. He was afforded the opportunity to appeal that decision and did so. He was provided with a reasoned decision by the Superior Court on appeal, when it affirmed the lower court's decision. He was afforded an opportunity to file a discretionary appeal to the Supreme Court and did so. He was provided with written notice of the Supreme Court's denial of allocatur.

But weighing the record before us, we nevertheless find that the particular—and peculiar—construction of the state post-conviction DNA testing statute applied by the PCRA court in Wade's case was fundamentally unfair.

As written, the statute affords an applicant for post-conviction DNA testing a fair procedure for seeking relief. Notably, as Pennsylvania state courts have repeatedly recognized, "the statute does not require [a] petitioner to show that the DNA testing results would be favorable." *See Commonwealth v. Irizarry*, No. 1386 MDA 2018, 2019 WL 1750839, at *2 (Pa. Super. Ct. Apr. 16, 2019); *Commonwealth v. Williams*, 35 A.3d 44, 50 (Pa. Super. Ct. 2011); *Commonwealth v. Smith*, 889 A.2d 582, 584 (Pa. Super. Ct. 2005). Rather, the statute requires the applicant to "present a

*prima facie* case demonstrating that . . . DNA testing of the specific evidence, *assuming exculpatory results*, would establish . . . the applicant's actual innocence of the offense for which the applicant was convicted." 42 Pa. Cons. Stat. Ann. § 9543.1(c)(3)(ii)(A). "The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence." *Payne*, 129 A.3d at 563. As the *Payne* court recognized,

> with respect to the burden on a Section 9543.1 petitioner, "no reasonable probability" [that the testing would produce exculpatory evidence sufficient to establish the applicant's actual innocence] does not mean "no likely probability." It should go without saying that the most *likely* result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict. However, the very purpose of Section 9543.1 must be to afford the petitioner the *opportunity* to demonstrate the unlikely.

*Id.* (emphasis in original).

But that is not how the PCRA court interpreted and applied the statute in Wade's case.

Wade seeks touch DNA testing of various items of evidence— namely, the clothing the victim was wearing when her body was found, and the trash bag in which her body was found—advancing a

"redundancy" theory based on *Conway*. In particular, Wade has noted that the victim was found with her sweater on backwards, suggesting that she had been redressed by her assailant.[9] We further note that that her body was nude from the waist to her ankles, with her pantyhose and underpants pulled down to her ankles. Among other items of clothing, Wade seeks touch DNA testing of the victim's sweater, bra, pantyhose, and underpants—items of clothing which the assailant likely touched in assaulting her or transporting her body, and with which incidental contact by other individuals was unlikely. Wade suggested that, if multiple sets of epithelial cells belonging to an individual other than himself were found on these items of clothing or the trash bag in which the victim was found, these results would give rise to an inference that a separate assailant, other than Wade, had killed her.

The PCRA court rejected Wade's argument on the grounds that it was "speculative" and relied on "a bald assertion that touch DNA [from a third person] will be recovered from the items of evidence."[10] (Doc. 23-2,

[9] He has also noted that his conviction was based entirely upon circumstantial evidence, and that he produced substantial evidence in support of an alibi defense.

[10] We note that the PCRA court relied on a Superior Court decision, *Commonwealth v. Smith*, 889 A.2d 582 (Pa. Super. Ct. 2005), for the

at 14.) In doing so, the PCRA court construed the DNA testing statute to read the critical words "assuming exculpatory results" entirely out of the statute, effectively foreclosing *any possibility whatsoever* of relief.

As we noted above, Wade possesses a state-created liberty interest in demonstrating his innocence in the context of post-conviction proceedings with appropriate evidence. *See Wagner*, 2012 WL 290093, at *8; *Grier*, 2011 WL 4971925, at *7. And while we may not sit in review of a state court decision for mere legal error, *see Exxon Mobil*, 544 U.S. at 284; *Great W. Mining & Mineral Co.*, 615 F.3d at 166; *FOCUS*, 75 F.3d at 840, we may properly consider whether the Pennsylvania post-conviction DNA testing statute, as construed by the state PCRA court in Wade's case, has deprived him of his due process rights, *see Osborne*, 557 U.S. at 69; *Wagner*, 2012 WL 2090093, at *15.

Under the facts presented, we find that the state PCRA court's

---

proposition that "[t]he statute does not contemplate the speculative type of argument advanced by [Wade.]" (Doc. 23-2, at 14 (quoting *Smith*, 889 A.2d at 586).) But the speculation at issue in *Smith* was based on that applicant's contention that DNA testing would reveal the *absence* of his DNA, not the affirmative presence of another person's DNA. The *Smith* court found it too speculative to rely on the mere absence of a criminal defendant's DNA to establish his actual innocence. It did not conclude that the likelihood of exculpatory results was too speculative.

strained interpretation of the Pennsylvania DNA testing statute utterly foreclosed any possibility of relief for Wade.[11] By interpreting the statute in this fashion, requiring Wade to do the impossible (prove that DNA testing would produce exculpatory results without access to the very evidence he seeks to test) and in contravention of an express statutory presumption that DNA testing would indeed produce exculpatory results, Wade has been denied the opportunity promised by this statute to demonstrate his actual innocence.[12] We find this to be fundamentally unfair and a violation of Wade's federal constitutional right to procedural due process. *See Osborne*, 557 U.S. at 69; *Wagner*, 2012 WL 2090093, at

---

[11] If this interpretation of the statute by the PCRA court in Wade's case were applied to other applicants, they too would be utterly foreclosed from obtaining relief. The prospect of relief under DNA testing procedures that require, as a threshold matter, proof that the requested DNA testing will produce exculpatory results to obtain that DNA testing in the first instance is circular and entirely illusory.

[12] Moreover, we note that that, assuming the exculpatory results posited by Wade and ignored by the state courts—DNA evidence that a third person, other than Wade, had touched her sweater, her bra, her pantyhose, her underpants, and the inside of the trash bag in which she was found—it is difficult to imagine a scenario in which a reasonable juror would have found him guilty beyond a reasonable doubt, notwithstanding the quantum of circumstantial evidence arrayed against him. Although the prospect of obtaining such an overwhelmingly favorable result from touch DNA testing is unlikely, as we noted above, the intent of the Pennsylvania statute is to afford the applicant an *opportunity* to demonstrate the unlikely. *See Payne*, 129 A.3d at 563.

*15.

Accordingly, we will grant judgment in favor of the plaintiff with respect to Count I of the complaint.

## B. First Amendment Access-to-Courts Claim

Wade also contends that the defendants have violated—and continue to violate—his constitutional right of access to courts by denying him access to potentially exculpatory DNA evidence.

It is well-established that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). At least one federal court has found that "[d]enying prisoners access to potentially exculpatory DNA evidence limits meaningful access to the courts in even more profound terms than denying access to a law library or attorney." *Wade v. Brady*, 460 F. Supp. 2d 226, 250 (D. Mass. 2006). But "[a] prisoner raising an access-to-courts claim must show that the denial of access caused him to suffer an actual injury." *Garcia v. Dechan*, 384 Fed. App'x 94, 95 (3d Cir. 2010) (per curiam); *see also Lewis v. Casey*, 518 U.S.

343, 351 (1996). "An actual injury occurs when the prisoner is prevented from or has lost the opportunity to pursue a 'nonfrivolous' and 'arguable' claim." *Garcia*, 384 Fed. App'x at 95; *see also Christopher v. Harbury*, 536 U.S. 403, 415 (2002). This injury requirement reflects the fact that "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher*, 536 U.S. at 414–15.

Here, the underlying claim is a prospective PCRA petition in which Wade would seek release or a new trial based upon any exculpatory DNA evidence obtained as a result of his motion for post-conviction DNA testing. The denial of that motion, impeding his access to potentially exculpatory DNA evidence, is the official act frustrating that prospective litigation and purportedly denying Wade meaningful access to the courts.

While Wade may have a nonfrivolous and arguable claim for relief under the Pennsylvania DNA testing statute, *see supra*, without the results of the touch DNA testing he has requested, it is premature to conclude that he has established a nonfrivolous and arguable underlying claim for PCRA relief. While the DNA testing statute mandates a presumption of exculpatory results for the purpose of obtaining access to

evidence for DNA testing, there is no such presumption with respect to Wade's underlying PCRA claim—indeed, if anything, there is a presumption *against* relief under both state PCRA and federal habeas law.

For the time being, Wade is unable to satisfy the actual injury element of an access-to-courts claim. Accordingly, we will dismiss Count II of the complaint, asserting an access to courts claim, without prejudice for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. § 1915A(b)(1).

## V. CONCLUSION

For the foregoing reasons, Count II of the complaint will be dismissed without prejudice for failure to state a claim, and judgment will be entered in favor of the plaintiff with respect to Count I of the complaint.

An appropriate order will follow.

Dated: May 13, 2019
*s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge